JS 44 (Rev. 12/07)

**BMS**

**CIVIL COVER SHEET**

16-R-5446

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Steven Reese | Waterford Hotel |

16   5446

**(b)** County of Residence of First Listed Plaintiff **Montgomery County**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **Connecticut**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Gallagher Law Group, PC, 1055 Westlakes Drive, 3rd Fl
610-647-5027

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☒ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 USC 1981 et seq; Family and Medical Leave Act
Brief description of cause:

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23
**DEMAND $** 150,000.00
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions): JUDGE
DOCKET NUMBER

OCT 17 2016

DATE 10/12/16
SIGNATURE OF ATTORNEY OF RECORD   S.T.

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

**APPENDIX F**

### UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:___307 Independence Road King of Prussia, PA 19406

Address of Defendant:_____914 Hartford Turnpike, Waterford, Ct. 06385

Place of Accident, Incident or Transaction:___Conshohocken___, PA_____    *(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a)).    Yes ☐ No ☒

Does this case involve multidistrict litigation possibilities?    Yes ☐ No ☒

*RELATED CASE, IF ANY:*

Case Number: __N/A_____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes ☐ No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes ☐ No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes ☐ No ☒

CIVIL: (Place __ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. _X_ All other Federal Question Cases –FMLA, 42 USC 1981
    (Please specify)

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify)

16    5446

OCT 17 2016

**BMS** **ARBITRATION CERTIFICATION**
*(Check appropriate Category)*

I, _____John A. Gallagher_____, counsel of record do hereby certify:

_X_ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case **do not** exceed the sum of $150,000.00 exclusive of interest and costs;

_____ Relief other than monetary damages is sought.

DATE: __10/17/16____    ___John A. Gallagher_____    _____61914_____
                          Attorney-at-Law                          Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __10/17/16____    ___John A. Gallagher_____    _____61914_____
                          Attorney-at-Law                          Attorney I.D.#

**BMS**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | |
|---|---|
| STEVEN A. REESE | : **16    5446** |
| Plaintiff | : CIVIL ACTION NO.: |
| v. | : |
| WATERFORD HOTEL GROUP, INC. | : |
| and | : |
| WATERFORD GROUP, L.L.C. | : |
| and | : |
| MARY CULBERT | : |
| and | : |
| PETER CAMPANINI | : |
| and | : |
| JUDITH MORAN | : |
| Defendants | : JURY TRIAL DEMANDED |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.                      ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
  and Human Services denying plaintiff Social Security Benefits                            ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
  exposure to asbestos.                                                                   ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
  commonly referred to as complex and that need special or intense management by

OCT 17 2016

the court.  (See reverse side of this form for a detailed explanation of special management cases.)

( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.

( x )

**Date**
10/17/16

**Attorney-at-law**
John A. Gallagher, Esq.

**Attorney for**
Plaintiff

**Telephone**
610-647-5027

**FAX Number**
610-647-5024

**E-Mail Address**
jag@johnagallagher.com



$400

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

STEVEN A. REESE          :       **16**     **5446**

      Plaintiff      :   CIVIL ACTION NO.:

    v.                   :

WATERFORD HOTEL GROUP, INC.   :

    and                  :

WATERFORD GROUP, L.L.C.      :

    and                  :

MARY CULBERT              :

    and                  :

PETER CAMPANINI          :

    and                  :

JUDITH MORAN              :
        Defendants      :   JURY TRIAL DEMANDED

---

### COMPLAINT

Plaintiff, Steven A. Reese, by and through his undersigned counsel, the Gallagher Law Group, P.C., files this Complaint against defendants, Waterford Hotel Group, Inc., Waterford Group, L.L.C., Mary Culbert, Peter Campanini and Judith Moran, and in support thereof avers:

### JURISDICTION

1.      The Court has jurisdiction over this matter by its authority to hear cases arising under the laws of the United States pursuant to 28 U.S.C. §§1331, and the specific jurisdictional provisions found within the Family and Medical Leave Act of 1993, 29 U.S.C. §§2601 *et seq.,* ("FMLA"), the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. §§12101, *et*

*seq.*, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e, *et seq.*, and the Equal Rights Act of 1866, as amended, 42 U.S.C. §§1981, *et seq.*

2.      Plaintiff is in addition to the aforementioned federal claims seeking recovery under Pennsylvania's Human Relations Act of 1955, as amended, 43 Pa.C.S. §§951 to 963.

3.      The Court has jurisdiction over the state law claim(s) set forth herein pursuant to 28 U.S.C. §1367(a), as same is/are closely related to the claims in the action within the Court's original jurisdiction.

4.      Plaintiff has exhausted his administrative remedies, as he dual-filed a Charge of Discrimination with EEOC on January 14, 2015, alleging discrimination/retaliation based upon disability, race, color and national origin against and Marriott, and more than a year has passed since that filing.

5.      Insofar as his state law-based discrimination claims are concerned, plaintiff waited more than 1-year from the date of his dully-filed Charge before initiation this action.

**VENUE**

6.      Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C.S. §1391(b) because, *inter alia*, 1) all, the substantial majority of or at a minimum most of plaintiff's claims arose in the Eastern District of Pennsylvania.

**THE PARTIES**

A.  **Plaintiff**

7.      Plaintiff, Steven A. Reese is an adult individual residing at 307 Independence Road King of Prussia, PA 19406.

8.      During all times material hereto, plaintiff was employed at the Residence Inn by Marriott located in Conshohocken, Pennsylvania ("RIBM").

9.      Plaintiff commenced employment at RIBM on or about March 26, 2012.

10.     During times material hereto, plaintiff was employed as the full-time Night Auditor at RIBM.

11.     Plaintiff's last day of work at RIBM was October 2, 2014.

### A.     Mr. Reese is an Employee Covered by the FMLA

12.     Plaintiff had been employed by the Waterford defendants for more than 12 months and had worked more than 1,250 hours during the 12 months preceding his FMLA-covered leave(s).

13.     Accordingly, he is a covered "employee" as that term is defined at §2611(2) of FMLA.

14.     At all times relevant hereto, plaintiff was eligible for FMLA leave, having not exhausted his rights thereto during the 12 months preceding his termination.

### B. The Waterford Defendants

####  i.     *Corporate Information and Operations of Waterford Hotel Group, Inc.*

15.     Waterford Hotel Group, Inc. ("WHG") was formed via an incorporation in the state of Connecticut on October 2, 1984.

16.     WHG is a corporate business entity registered and licensed to do business in Pennsylvania with its principle place of business located at 914 Hartford Turnpike, Waterford, Ct. 06385.

17.     On its Website, waterfordhotelgroup.com, WHG proclaims, "Waterford Hotel Group is an independent, third-party hotel management company and approved operator for major hotel brands including Marriott, Hilton and Starwood…We have years of experience operating under such well-known flags as Marriott, Hilton, Sheraton, Radisson, Holiday Inn, Homewood Suites, Residence Inn, Courtyard, and Comfort Inn."

####  ii.     *Corporate Information and Operations of Waterford Group, L.L.C.*

3

18.     Waterford Group, L.L.C. ("WGL") was formed via an incorporation in the state of Delaware on February 2, 1999.

19.     On September 21, 1999, WGL incorporated in the state of Connecticut.

20.     WGL is a corporate business entity registered and licensed to do business in Pennsylvania with its principle place of business located at 914 Hartford Turnpike, Waterford, Ct. 06385.

21.     On the WHG Website, WGL is described as "a group of companies and partnerships specializing in the development, ownership, and management of hotel, venue, and gaming projects."

     *ii.*     *WHG and WGL Constitute a Single, Integrated Enterprise and are Indistinguishable from One Another*

22.     During all times material hereto, WGH was a wholly-owned subsidiary of WGL.

23.     An examination of information available from the Connecticut Secretary of State, waterfordhotelgroup.com and public records discloses that WGL and WHG share the same:

- Address:                                914 Hartford Turnpike, Waterford, Ct. 06385
- Phone Number:                     860-442-4559
- Telefax Number:                    860-437-7752
- Website:                                 waterfordhotelgroup.com[1]
- Employee e-Mail format/suffixes:     1st initiallastname@waterfordgroup.net
- Principal:                               Len Wolman
- Chairman and CEO:               Len Wolman
- Principal and Director:           Mark Wolman

---

[1]     Although WGL sometimes identifies its Website as waterfordgroup.net, that address "points" to waterfordhotelgroup.com. The waterfordgroup.net domain is however used in connection with the e-mail addresses of all WHG employees (first initiallastname@waterfordgroup.net).

- President and COO:                               Robert Winchester

- Chief Financial Officer:                         Alan Angel

- President and COO:                               Robert Winchester

- V.P. of Acquisitions & Development:   Gary Avigne

- Chief Financial Officer:                         Michael Heaton

- V.P. Human Resources:                         Judith Moran

- V.P. Sales & Revenue Management:     Karen Bachofner;

- V.P. Constr., Eng. & Tech. Services:    John Delgross

- V.P. Information Technology:               Michael Scott

24.     Plaintiff believes, and therefore avers, that WGL and WGH share the same, or predominantly the same, members on their respective Boards of Directors.

     *iii.    The Waterford Defendants Constitute Plaintiff's Joint Employer*

25.     In a press release issued in or around November 2011, WHG declared that it "offers centralized accounting, financial reporting, strategic marketing, human resources, and day-to-day operations management systems to increase market share and profitability at all properties."

26.     The following facts are among many that exist which demonstrate that WGL and WHG exercised complete and total dominion and control over RIBM's day to day operations, and over employees who worked at RIBM, including plaintiff, and co-determined matters governing the essential terms and conditions of plaintiff's employment such as those relating to compensation, benefits, response to employee complaints and hiring/firing decisions, and were therefore plaintiff's joint employer:

a. Defendant Judith Moran is presently, and was at all material times hereto, identified on Waterford Group, L.L.C.'s Website as its Vice President of Human Resources;

b. During the first half of 2014, Ms. Moran evaluated the benefits paid to RIBM employees, amended Waterford policies insofar as employee's entitlement to benefits were concerned, and conducted an audit of hours worked by employees who worked at RIBM;

c. In early July of 2014, Ms. Moran issued reports to all RIBM employees in which she:

   i. Announced Waterford's new policy - that only employees who worked an average of at least 30 hours per week would be entitled to company benefits; and,

   ii. Provided each employee with her findings as to how many hours per week her audit had found they had worked during the first 56-months of 2014.

d. In just such a letter, Ms. Moran advised plaintiff, *inter alia*, that he had in between January and July 2014 worked an average of 41.87 hours per week;

e. on July 15, 2015, a Position Statement was filed with EEOC by "Respondent Waterford Hotel Group" ("WFPS").  The WFPS asserts that, in response to an issue raised by plaintiff just weeks before his employment terminated, defendants Culbert and Campanini, "made a conference call to Judy Moran [ ], Waterford's Vice President of Human Resources.";

f. The Position Statement notes that soon thereafter, Ms. Moran called Mr. Reese in an effort to schedule a meeting with him and RIBM management in order to discuss his continuing employment;

g. Defendant Mary Culbert (RIBM's General Manager), testified at plaintiff's unemployment hearing that she was in continual contact with Ms. Moran concerning plaintiff's employment issues during the weeks that preceded the cessation of same;

h. An October 16, 2014 letter sent to plaintiff in which he was informed "[w]e are writing to accept your voluntary resignation" was prepared on Waterford Hotel Group, Inc. letterhead and signed by Ms. Moran above the designation "Vice President of Human Resources."

27.     At all times material hereto, WHG and WGL collectively exercised dominion and control over material aspects of plaintiff's day-to-day employment activities.

28.     As the aforementioned facts demonstrate, at all times material hereto, WHG and WGL collectively created, maintained and enforced employment policies and practices that plaintiff was required to follow throughout his employment.

29.     As the aforementioned facts demonstrate, at all times material hereto, WHG and WGL collectively made and instituted decisions concerning the terms and conditions of plaintiff's job duties and responsibilities.

30.     At all times material hereto, WHG and WGL collectively made and instituted decisions concerning the terms and conditions of plaintiff's compensation and benefits.

31.     As the aforementioned facts demonstrate, at all times material hereto, WHG and WGL collectively made and instituted decisions relating to the hiring, promotion, demotion, discipline and/or termination of plaintiff and his co-workers.

32.     At all times material hereto, WHG and WGL collectively made and instituted decisions relating to creating, applying and/or enforcing personnel policies and practices applicable to employees who worked at the RIBM including, and most particularly, plaintiff.

33.     At all times material hereto, WHG and WGL collectively made and instituted decisions concerning whether state and federal employment laws/regulations applied to various situations involving employees who worked at RIBM including, and most particularly, plaintiff.

34.     As the aforementioned facts demonstrate, at all times material hereto, WHG and WGL collectively made and instituted decisions to abide by and/or ignore state and federal employment laws/regulations in various situations involving employees who worked at RIBM.

35.     WHG and WGL managed and/or operated all material aspects of the RIBM, including but not limited to personnel decisions relating to plaintiff and his co-workers.

36.     WHG and WGL will wherever appropriate be referred to herein as "Waterford."

7

**C.  The Waterford Defendants are an Employer Covered by the FMLA**

37.     At all times during the relevant period, Waterford employed more than 50 persons within a 75-mile radius of plaintiff's work location(s).

38.     Accordingly, Waterford was at all relevant times a covered "employer" as that term is defined at §2611(4)(A)(i) of the FMLA.

**D.  Individual Defendant Peter Campanini**

39.     Defendant, Peter Campanini is an adult individual, United States citizen and, plaintiff believes, a resident of the Commonwealth of Pennsylvania whose personal residence is unknown to plaintiff.

40.     Mr. Campanini was at all times material hereto the Front Desk Manager at RIBM, and was plaintiff's immediate supervisor.

41.     At all times material hereto, Mr. Campanini:

   a.   created, delivered, explained and enforced employment policies applicable to plaintiff and similarly situated RIBM employees who provided front desk services;

   b.   prepared the weekly work schedules governing plaintiff and similarly situated RIBM employees who provided front desk services, determined requests for modification of same and provided oversight to insure compliance therewith;

   c.   determined the number of work hours per week that plaintiff and similarly-situated RIBM employees who provided front desk services, this controlling their earnings and eligibility for company benefits;

   d.   conducted performance reviews of plaintiff and similarly situated RIBM employees who provided front desk services;

   e.   issued and enforced discipline to all RIBM employees who provided front desk services;

   f.   acting in coordination with defendant Mary Culbert, made recommendations to defendant Judith Moran concerning compensation and perquisites to be paid to plaintiff and similarly-situated RIBM employees who provided front desk services;

8

g.  acting in coordination with defendant Mary Culbert, made recommendations to defendant Judith Moran concerning decisions to hire, promote, demote and/or fire RIBM employees who provided front desk services; and,

h.  was a direct participant in all decisions concerning plaintiff's employment status subsequent to June 1, 2016 including, but not limited to: 1) considering and granting plaintiff's initial request for FML in June 2014; 2) denying plaintiff's right to and request for job restoration on or about July 10 and thereafter; 3) rejecting plaintiff's post-initial FML request for restoration of his work schedule, job duties and pre-FML allotment of weekly work hours; 4) ignoring and/or rejecting plaintiff's allegations of unlawful discrimination and retaliation; 5) ignoring and/or refusing plaintiff's requests that he be provided a chair to use in his office when he worked overnight; and, 6) considering and denying plaintiff's request for FML in September 2014; and, coordinating and bringing about plaintiff's alleged and pre-textual voluntary resignation.

42.     In view of the duties and responsibilities that he carried out on behalf of Waterford during plaintiff's employment, Mr. Campanini was plaintiff's "employer" as that term is defined under FMLA and 42 U.S.C. §1981.

**E.  Individual Defendant Mary Culbert**

43.     Defendant, Mary Culbert, is an adult individual, United States citizen and resident of the Commonwealth of Pennsylvania whose personal residence is unknown to plaintiff.

44.     Ms. Culbert was the General Manager of RIBM, and thus was the ultimate and final authority who was regularly employed at RIBM, and was therefore plaintiff's ultimate supervisor.

45.     Ms. Culbert:

a.  created, delivered, explained and enforced employment policies applicable to plaintiff and all other RIBM employees;

b.  acting in coordination with all RIBM department managers, approved and/or amended performance reviews of all RIBM employees, including plaintiff;

c.  issued and enforced discipline to all RIBM employees;

d.  acting in coordination with all RIBM department managers, made recommendations to defendant Judith Moran concerning compensation and perquisites to be paid to plaintiff and all other RIBM employees;

9

e.  acting in coordination with all RIBM department managers, made recommendations to defendant Judith Moran concerning decisions to hire, promote, demote and/or fire RIBM employees; and,

f.  was a direct participant in all decisions concerning plaintiff's employment status subsequent to June 1, 2016 including, but not limited to: 1) considering and granting plaintiff's initial request for FML in June 2014; 2) denying plaintiff's right to and request for job restoration on or about July 10 and thereafter; 3) rejecting plaintiff's post-initial FML request for restoration of his work schedule, job duties and pre-FML allotment of weekly work hours; 4) ignoring and/or rejecting plaintiff's allegations of unlawful discrimination and retaliation; 5) ignoring and/or refusing plaintiff's requests that he be provided a chair to use in his office when he worked overnight; and, 6) considering and denying plaintiff's request for FML in September 2014; and, coordinating and bringing about plaintiff's alleged and pre-textual voluntary resignation.

46.  In view of the duties and responsibilities that Ms. Culbert carried out on behalf of Waterford during plaintiff's employment, Ms. Culbert was plaintiff's "employer," as that term is defined under FMLA.

**F.  Individual Defendant Judith Moran**

47.  Defendant, Judith Moran, is an adult individual, United States citizen and resident of the Commonwealth of Pennsylvania whose personal residence is unknown to plaintiff.

48.  Ms. Moran was at all times material hereto Waterford's Vice President of Human Relations.

49.  In that role she was responsible for creating, publishing and enforcing all personnel policies applicable to Waterford employees, including plaintiff.

50.  Further, Ms. Moran, acting as an agent for all Waterford employees, was charged with and fulfilled the role as the point person for all negotiations between Waterford and third-parties offering a variety of benefit packages (i.e. medical, workers compensation, disability, retirement, 401(k)) which were in turn offered to Waterford employees such as plaintiff.

10

51.    Ms. Moran additionally made decisions concerning the compensation levels, benefit eligibility and leave policies offered to Waterford employees.

52.    Moreover, Ms. Moran was the final authority and administrator who, on behalf of Waterford, governed its compliance with state and federal laws governing minimum wage, overtime, employee classification, entitlement to reasonable accommodations pursuant to ADA and leave requirements under FMLA.

53.    In her role as Vice President of Human Relations, Ms. Moran was routinely, if not always, involved in all hiring and firing decisions, and frequently, if not always, issued letters of termination such as that issued to plaintiff instantly.

54.    At all times material hereto, Ms. Moran shared responsibility for all major personnel decisions concerning RIBM employees, including that involving plaintiff, with Ms. Culbert.

55.    In fact, and as testified to under oath at plaintiff's unemployment hearing, Ms. Moran was in regular contact with Ms. Culbert concerning plaintiff's complaints concerning his mistreatment by the company, and the conflict involving Mr. Ehiogie.

56.    During this time, Ms. Moran on at least two occasions endeavored to coordinate meetings and/or conference calls between plaintiff, herself and RIBM management in order to address said issue.

57.    At all times material hereto, Ms. Moran:

  a.    created, delivered, explained and enforced employment policies applicable to plaintiff and all other RIBM employees;

  b.    acting in coordination with all RIBM department managers, approved and/or amended performance reviews of all RIBM employees, including plaintiff;

  c.    issued and enforced discipline to all RIBM employees;

11

    d.   acting in coordination with all RIBM department managers, made recommendations to defendant Judith Moran concerning compensation and perquisites to be paid to plaintiff and all other RIBM employees;

    e.   acting in coordination with all RIBM department managers, made recommendations to defendant Judith Moran concerning decisions to hire, promote, demote and/or fire RIBM employees; and,

    f.   was a direct participant in, and/or all decisions concerning plaintiff's employment status subsequent to June 1, 2014 including, but not limited to: 1) considering and granting plaintiff's initial request for FML in June 2014; 2) denying plaintiff's right to and request for job restoration on or about July 10 and thereafter; 3) rejecting plaintiff's post-initial FML request for restoration of his work schedule, job duties and pre-FML allotment of weekly work hours; 4) ignoring and/or rejecting plaintiff's allegations of unlawful discrimination and retaliation; 5) ignoring and/or refusing plaintiff's requests that he be provided a chair to use in his office when he worked overnight; and, 6) considering and denying plaintiff's request for FML in September 2014; and, coordinating and bringing about plaintiff's alleged and pre-textual voluntary resignation.

58.    In early July 2014, Ms. Moran, issued reports to RIBM employees in which she advised that only employees who worked an average of at least 30 hours per week would be entitled to company benefits.

59.    In an undated letter sent under WHG letterhead to plaintiff, Ms. Ms. Moran informed him that, in between January 1 and June 30, 2014, he had worked an average of 41.87 hours per week.

60.    In view of the duties and responsibilities that Ms. Culbert carried out on behalf of Waterford during plaintiff's employment, Ms. Culbert was plaintiff's "employer" as that term is defined under FMLA.

## FACTUAL BACKGROUND

### A. Mr. Reese's Pre-Family and Medical Leave ("FML") Job Title, Work Schedule, etc.

61.    Mr. Reese started work at the RIBM on March 26, 2012.

62.     Soon after, he was promoted to the position of Full-Time Night Auditor, the position in which he served until his initial medical leave in June 2014.

63.     In this capacity, plaintiff was typically scheduled to work 5 overnight (i.e. 11:00 p.m. top 6:00 a.m. shifts per week).

64.     If plaintiff worked in excess of 40 hours in a given week, he was paid overtime.

65.     The following is a reasonably accurate description of plaintiff's duties when he served as RIBM's full-time Night Auditor:

> Check figures, postings, and documents for accuracy. Record, store, access, and/or analyze computerized financial information. Control and secure cash and cash equivalents for property according to cash handling policy and procedures. Organize, secure, and maintain all files and records in accordance with document retention and confidentiality policies and procedures. Prepare, maintain, and distribute statistical, financial, accounting, auditing, or payroll reports and tables. Audit statistical, financial, accounting, auditing, or payroll reports and tables. Audit and reconcile all revenue postings.

66.     When Plaintiff was not working the Night Shift, he served as a Front Desk Assistant, with no "auditor" responsibilities.

## B. The *Jackson* Lawsuit

67.     On April 29, 2013, a lawsuit captioned *Jackson v. Waterford Hotel Group, Inc. and Mary Culbert* was filed in this court and assigned Civil Action No. 2:13-cv-02310.

68.     Plaintiff, Brian Jackson, was an African-American man who had worked for 5-years as a bookkeeper at the RIBM.

69.     Mr. Jackson alleged that his employment was unremarkable until after Ms. Culbert was hired by Waterford to act as General Manager of the RIBM in November 2011.

70.     Plaintiff Jackson alleged, *inter alia*, that he was subjected to disparate treatment and a hostile work environment fostered and maintained by Ms. Culbert.

13

71.     He averred further that Ms. Culbert's actions were motivated by racial animus.

72.     Plaintiff averred that in January 2013 he made a complaint concerning such mistreatment to Ms. Culbert and Waterford's then-Director of Human Resources, Dean Riddle.

73.     Several weeks later, after he had made another complaint, Mr. Jackson was fired.

74.     In April 2013, Mr. Jackson filed a §1981 action in this court.

75.     In August 2013, Mr. Riddle, who had worked for Waterford since 2004, departed his employment from Waterford.

76.     Shortly thereafter, a letter from plaintiff's counsel to the court dated October 3, 2013 advised that the case had been "resolved," and requested the entry of a L.R. 41.1(b) order (which was subsequently issued).

77.     After the *Jackson* lawsuit was filed, plaintiff and his co-workers were told on numerous occasion that changes were coming because the company was facing significant pressure from third-parties to immediately create a more diverse workforce.

78.     Plaintiff and others observed increasing chatter from all levels of management concerning the need to diversify as the Jackson case progressed.

79.     This chatter related to all aspects of the operation of RIBM, but it was loudest when supervisors and managers were faced with choices concerning who to hire or fire, promote or demote, reward or discipline.

80.     The verbal reinforcement of the defendants' new direction towards diversity was accompanied by an obvious trend towards hiring and advancing people of color or foreign birth, promoting minorities and choosing white Americans for demotion, discipline or termination (constructive and patent).

81.     One of the candidates for this culling process was Mr. Riddle, who the employees at Waterford widely-viewed as having been forced out in favor of Ms. Culbert, even though it was she who Mr. Jackson alleged was the main proponent of his problems.

82.     This widely-held belief was reinforced when, "after the smoke was cleared," Mr. Riddle was brought back into the fold when he was hired to serve as the Director of Human Relations for one of WGL's affiliates (Waterford Venue Services) in August 2014.

83.     One of the benefactors of defendant's putative affirmative action program was Kenneth Ehiogie, who ultimately replaced plaintiff.

### C. Enter Kenneth Ehiogie

84.     In April 2014, Kenneth Ehiogie was hired by Waterford to work at the RIBM.

85.     Mr. Ehiogie is a black man who was born in the Federal Republic of Nigeria.

86.     Prior to being hired by defendants, Mr. Ehiogie had on May 6, 2013 filed a Complaint in this Court.

87.     That Complaint in *Ehiogie v. Wells Fargo*, 2:13-cv-2526, which is one of the first entries to populate the landing page if one simply enters "Kenneth Ehiogie" into the Google Search Bar (it competes for the top listing spot with numerous references to Mr. Ehiogie's mug shot and his October 2, 2013 arrest in Montgomery County), discloses the following:

a.     in October 2008, Mr. Ehiogie was hired as a bank teller for Wells Fargo;

b.     in December 2010, he was fired due to mishandling his cash drawer;

c.     Mr. Ehiogie contended that his termination resulted from unlawful discrimination based upon his race, color and national origin;

d.     in August 2013 the case settled; no discovery had been conducted.

88.     Mr. Ehiogie was hired to work predominantly as a front desk clerk on evening shifts (3-11).

15

89.     In addition, as a result of his bank teller experience, Mr. Ehiogie was assigned the position of part-time Night Auditor.

90.     In this role, he was to be scheduled to fill-in for plaintiff on the overnight shift when plaintiff was not scheduled to work same.

91.     Mr. Reese trained Mr. Ehiogie on the Night Auditor duties, and Mr. Ehiogee performed same when he filled in for plaintiff.

### D. The 6-Weeks Immediately Preceding Plaintiff's First Family and Medical Leave

92.     By May 11, 2014, Mr. Ehiogie was trained on the duties of a front desk clerk and those of the part-time Night Auditor.

93.     In between May 11 and June 26, 2014 (which is when plaintiff took Family and Medical Leave for the first time), the allocation of shifts and hours between plaintiff and Mr. Ehiogie was established as follows:

| Plaintiff Steven A. Reese | | | | Comparator/Replacement Kenneth Ehiogie | | | |
|---|---|---|---|---|---|---|---|
| Total HW Pre-FMLA | Total OVNT HW Pre-FMLA | % of OVNT HW Out of All HW Pre-FMLA Period | Average HW Per Week Pre-FMLA | Total HW Pre-FMLA | Total OVNT HW Pre-FMLA | % of OVNT HW Out of All HW Pre-FMLA Period | Average HW Per Week Pre-FMLA |
| **215** | **200** | **93%** | **35.83** | 226.5 | 135.5 | 60% | 37.75 |

## Chart Key

"Pre-FMLA"        Sunday May 11 through Saturday June 28, 2014, *excluding* week of May 18-24 due to absence of time records for that week. Although Mr. Reese's FMLA leave started on Thursday June 26, he had worked 4 shifts (34 hours) that week.  Further, insofar as plaintiff and Mr. Ehiogie are concerned, the June 22-28 schedule is virtually identical to that of June 15-21.

"OVNT"            Overnight Shift Hours (11:00 p.m. to 7:00 a.m.)

"HW"              Hours Worked

16

### E.  Plaintiff's First FML Leave

94.    In June 2014, plaintiff informed defendants that he required a medical leave of absence.

95.    Plaintiff informed defendants that he required leave because he had a substance abuse problem, and was scheduled to receive treatment at a medical facility in order to remedy same.

96.    Leave under the Family and Medical Leave Act ("FMLA") is permitted/required where, as here, the employee seeks leave at a medical facility in order to treat a substance abuse problem.

97.    Pursuant to EEOC Guidelines (and adapted by a majority of jurisdictions, including the 3rd Circuit), "[p]ersons addicted to drugs, but who are no longer using drugs illegally and are receiving treatment for drug addiction or who have been rehabilitated successfully, are protected by the ADA from discrimination on the basis of past drug addiction."

98.    Plaintiff's chemical dependence on addictive narcotics constituted a disability as that term is defined under the ADA.

99.    Plaintiff's request for medical leave of absence constituted a request for a reasonable accommodation as that term is defined in ADA.

100.    Alternatively, plaintiff believes, and therefore avers, that defendants regarded him as disabled.

101.    During Mr. Reese's FML, Mr. Ehiogie worked exclusively on the night shift and was given substantial overtime hours.

102.    This treatment was successful, and plaintiff was clean and sober when he informed defendants that he was ready, willing and able to return to work as of July 10, 2014.

17

**F.    Post-FML – Mr. Reese Not Reinstated and Instead
       Subjected to Involuntary Unpaid Suspension**

103.    Although plaintiff sought reinstatement to his former position effective Thursday July 10, 2014, RIBM denied him this protected right.

104.    Instead, Mr. Reese was initially told to "take an additional week off" (i.e. July 10-17), which he was forced to do.

105.    During that week, plaintiff was not paid.

106.    On Wednesday, July 16, plaintiff was summoned to a meeting with Mr. Campanini and Ms. Culbert.

107.    During that meeting, Mr. Campinini and Mary Culbert told plaintiff that Mr. Mr. Ehiogie had assumed plaintiff's duties while he was on FML, and "had done a real good job."

108.    They then informed him that Mr. Ehiogie would be retaining the full-time Night Auditor position going forward.

109.    Mr. Campanini and Mary Culbert continued by informing plaintiff that, going forward, he would be scheduled to work a variety of shifts, and would fill in on nights as needed.

110.    Plaintiff was therefore essentially provided with two choices: 1) resign; or, 2) accept the radical change to the terms and conditions offered to him by defendants.

111.    Left without a meaningful choice, Mr. Reese accepted the new, less desirable, terms and conditions and asked to be placed back onto the schedule.

112.    Plaintiff was finally placed onto the work schedule on Tuesday, July 22, 2015.

113.     He had been subjected to an involuntary unpaid leave in a retaliatory response to his having taken FMLA leave and/or being regarded as disabled (and thus an undesirable).

114.    Subjecting plaintiff to an involuntary unpaid suspension upon his scheduled return from his FML violated the provisions of FMLA.

18

115.    Subjecting plaintiff to an involuntary unpaid suspension upon his scheduled return from his medical leave violated the provisions of ADA.

116.    Subjecting plaintiff to an involuntary, unpaid suspension upon his scheduled return from FML constituted a willful and intentional violation of FLA, for which double damages should be awarded.

**G.    Damages Resulting from Post-FMLA Involuntary Unpaid Leave**

117.    As a consequence of the aforesaid unlawful acts, plaintiff lost 2-weeks of compensation in between July 10 and July 22, 2014.

**H.    Post-FML – Mr. Reese Subjected to Loss of Position, Putative Demotion and Reduction in Hours**

118.    In between July 10 and his last date of active work, October 2, 2014 ("the Interference Period"), plaintiff was subjected to unlawful and harmful employer actions that continued without respite.

119.    In the interest of consistency, an examination of the allocation of shifts and hours over the first 6-weeks following plaintiff's July 10 return from FML illustrates plaintiff's loss – and Mr. Ehiogie's gain.

| **Plaintiff Steven A. Reese** | | | | Comparator/Replacement Kenneth Ehiogie | | | |
|---|---|---|---|---|---|---|---|
| **Total HW Post-FMLA** | **Total OVNT HW Post-FMLA** | **% of OVNT HW Out of All HW Post-FMLA** | **Average HW Per Week Post- FMLA** | Total HW Post-FMLA | Total OVNT HW Post-FMLA | % of OVNT HW Out of All HW Post-FMLA | Average HW Per Week Post- FMLA |
| **180** | **81** | **45%** | **30** | 244 | 236 | 96.8% | 40.66 |

## Chart Key

"Post-FMLA"          **Sunday July 13 through Saturday August 23, 2014 is the first full 6-weeks immediately following plaintiff's return following his initial FMLA leave**

> (while plaintiff was prepared to return to work on Thursday July 10, we
> start with the first full workweek thereafter, beginning Sunday July 13)

"OVNT"     Overnight Shift Hours (11:00 p.m. to 7:00 a.m.)

"HW"       Hours Worked

120.    This trend is also evident if one starts on the first full workweek following

plaintiff's return from his involuntary unpaid leave on July 20 continued throughout the duration

of plaintiff's employment:

| Plaintiff Steven A. Reese | | | | Comparator/Replacement Kenneth Ehiogie | | | |
|---|---|---|---|---|---|---|---|
| Total HW Post-FMLA | Total OVNT HW Post-FMLA | % of OVNT HW Out of All HW Post-FMLA | Average HW Per Week Post- FMLA | Total HW Post-FMLA | Total OVNT HW Post-FMLA | % of OVNT HW Out of All HW Post-FMLA | Average HW Per Week Post- FMLA |
| **180** | **81** | **45%** | **30** | 244 | 236 | 96.8% | 40.66 |

## Chart Key

"Post-IVSP"     Sunday July 20 through Saturday October 2, 2014 is the 6-week period
immediately following plaintiff's return from the involuntary suspension
without pay he was subjected to following his initial FMLA leave.

"OVNT"          Overnight Shift Hours (11:00 p.m. to 7:00 a.m.)

"HW"            Hours Worked

121.    More specifically, plaintiff was subjected to, *inter alia*, the following adverse

employment actions during the Interference Period:

- His average weekly work hours were reduced to +/-30 per week;

- He was usually scheduled for 3 evening shifts and 2 night shifts per week, while Mr.
  Ehiogie worked almost exclusively night shifts; in other words, their schedules had
  basically been reversed;

- Mr. Ehiogie assumed the duties of the full-time Night Auditor; and,

20

- He was excluded from work-related activities, meetings, assignments, etc. that he had previously been invited to, involved with, etc., and was subjected to social isolation (pariah status).

**I.   Post-FML – Mr. Reese Subjected to Demotion, Sporadic Schedule, Reduction in Hours (and Compensation), Loss of Chair and Stigmatization**

122.    During the Interference Period, plaintiff was also subjected to a curious form of retaliation that manifested itself in a work-related injury.

123.    Prior to his FML, plaintiff had a work chair that he would sit in while he performed the financial aspects of the Night Auditor position.

124.    However, when he returned from FML, this chair was gone.

125.    Mr. Ehiogie had been provided a chair to use when he worked night shift, but whenever plaintiff "filled-in" on the night shift, the chair was absent.

126.    The chair was intentionally being removed from the Night Auditor office, so that plaintiff was forced to stand throughout the entire night shift, even when he was performing his accounting duties.

127.    When plaintiff inquired with management at RIBM about his missing chair, he was given a vague answer, but the chair remained missing.

128.    When he asked management at RIBM for a chair to use when he filled in for Mr. Ehiogie, his request was refused.

129.    Not surprisingly (predictably, in fact), the stress of standing for 8 hours at a time, often while leaning over to peer into a computer screen or make data entry, Mr. Reese suffered a a degenerative, stress-related injury to his knee, which rendered him incapable of performing his essential job duties.

130.    This condition so incapacitated plaintiff that he was forced to take off during the week of September 21-27.

131.    Plaintiff's leave during this week was unpaid.

132.    Mr. Reese informed RIBM management as to the cause and severity of his injury in the course of advising that he would be required to take at least a week off to rehabilitate his knee.

133.    The knee injury constituted a serious health condition and plaintiff was entitled to have his September 21-27 absence designated as FMLA Leave.

134.    Defendants failed to designate plaintiff's absence from work in between September 21-27 as leave protected under FMLA.

135.    Moreover, defendants were statutorily required to issue plaintiff notice of his FMLA rights.

136.    Defendants failed to provide plaintiff with notice of his right to FMLA Leave in connection with his September 2014 absence from work.

137.    Defendants failed in every way to satisfy the employer's obligations to provide plaintiff with notice of his FMLA leave rights in connection with his knee injury.

138.    Moreover, plaintiff was, without his knowledge or consent, placed on the schedule to work night shifts on Sunday, September 28 and Monday, September 29 because Mr. Ehiogie was scheduled to be off on those days.

139.    As a consequence, plaintiff, being fearful that he would lose his job if he stayed out long enough to allow his injury to fully-heal, returned to work before he was physically able to do so.

### J.   Damages During the Interference Period

140.    During the Interference Period, plaintiff suffered the following damages:

   a.   Loss of compensation as a result of a reduction in his scheduled work hours; and,

     b.   Loss of a week's wages due to the unpaid leave he was required to take during the week of September 21-27.

### K. The Retaliatory Discharge Claim – Facts Immediately Preceding Plaintiff's Last Day of Work

141.    Prior to plaintiff's initial FML, Mr. Ehiogie worked an average of approximately 36 hours per week on various shifts, was not entrusted with the responsibilities of the Night Auditor position, and was subordinate to plaintiff.

142.    During the three-weeks that comprised plaintiff's FML and subsequent IVSP (June 29 through July 22), Mr. Ehiogie worked an average of 47 hours a week only on the night shift, had full authority as the Night Auditor and was subordinate to no one.

143.    Perhaps most importantly, where Mr. Ehiogie was concerned, was that he in essence received a 28% increase in compensation as a result of plaintiff's FML and IVSP.

144.    Mr. Ehiogie was, upon information and belief, told that he had been awarded the full-time Night Auditor job while Mr. Reese was out of FML/ IVSP. Hence, when plaintiff returned on July 22, Mr. Ehiogie had a vested interest in making sure that the newly-established status quo remained unchanged.

145.    Plaintiff believes, and therefore avers, that Mr. Ehiogie was responsible for his missing chair and the continual denial of access to the chair used by Mr. Ehiogie.

146.    Plaintiff complained to management about these acts, and sought assistance, to no avail.

147.    Mr. Ehiogie was made aware about these complaints, and also was made aware that management took no actions to assist plaintiff in any way.

148.    Angry about plaintiff's complaints, and emboldened by management's appeasement of him via its inaction, Mr. Ehiogie then engaged in a course of threatening and harassing behavior directed at plaintiff.

149.    Again, plaintiff complained to management about these actions and, again, management did nothing to assist plaintiff or to remedy the situation.

150.    Ultimately, plaintiff's loss of title and responsibilities, which were exacerbated by a loss of earnings, resulted in a loss of self-esteem, humiliation, embarrassment and significant emotional trauma.

151.    The damages were greatly compounded by Mr. Ehiogie's systematic harassment, and management's utter failure to address and remedy plaintiff's concerns.

152.    These traumas collectively resulted in plaintiff's temporary departure from employment on or about October 2, 2014.

**L.  Plaintiff is Terminated**

153.    A letter to plaintiff dated October 16, 2014 issued on the letterhead of defendant Waterford Hotel Group, Inc. and signed by "Ms. Judy Moran, Vice President of Human Resources" states in pertinent part:

> You have not reported to work since October 2, 2014…We are writing to accept your voluntary resignation.

154.    A "COBRA Election Form" issued by "Waterford Hotel Group" includes the following pertinent information:

> Identification Number:    WAT034001751
> Qualifying Event:           Termination
> COBRA Start Date           October 2, 2014

155.    In a November 24, 2014 letter to the Pennsylvania Department of Labor prepared by an agent action on behalf of defendant Waterford Hotel Group, Inc. stated in pertinent part as follows:

> [On October 3, 2014], Claimant alleged that a co-worker (Kenneth E) was seen copying other worker's paychecks … His supervisor made arrangements for the claimant to continue working with no contact with Kenneth and the claimant agreed to work while the situation was investigated.

24

The next day (Saturday October 4, 2014) the claimant sent an email that he could not work until Kenneth was gone. The same occurred on October 5. 2014. An investigation was conducted and the decision was made not to terminate Kenneth's employment.

On October 9, 2014 at 2:00 claimant failed to attend a phone appointment with Judy Moran.... He indicated he would call on Monday October 13, 2014-. The claimant did not contact anyone and on October 16, 2014 a letter was sent indicating that we accepted his voluntary resignation. The Associate handbook [sic] states on page 6 in the Attendance Policy "If an Associate does not report to work for three (3) consecutive scheduled work shifts without an adequate excuse, he or she will be deemed to have voluntarily resigned their position due to job abandonment."

156.    As a result of the aforesaid conduct, Ms. Moran was plaintiff's "employer" as that term is defined under 42 U.S.C. §1981.

157.    Alternatively, if either Ms. Culbert or Mr. Campanini were not personally involved in some or all of the aforesaid unlawful treatment, they at a minimum aided, abetted, incited, compelled or coerced unlawful discrimination and retaliation because:

   a.  Although they knew or should have known that the plaintiff was being subjected to unlawful adverse employment actions motivated by animus because of his race, color and/or national origin (sometimes referred to as "reverse discrimination") but repeatedly refused to take prompt action to end the adverse employment action directed at plaintiff;

   b.  Although they knew or should have known that, subsequent to plaintiff's release to work without restrictions after his first FML, he was being subjected to unlawful adverse employment actions motivated by defendants' disability-based animus but repeatedly refused to take prompt action to end the adverse employment action directed at plaintiff;

158.    If either Ms. Culbert or Mr. Campanini were not directly involved in causing illegal adverse employment actions to be directed against plaintiff then, a result of the aforesaid conduct, either Ms. Culbert or Mr. Campanini were plaintiff's "employer" as that term is defined under PHRA.

159.

160.    Alternatively, if Ms. Moran was not personally involved in some or all of the aforesaid unlawful treatment, she at a minimum aided, abetted, incited, compelled or coerced unlawful discrimination and retaliation because:

    a.   Although she knew or should have known that the plaintiff was being subjected to unlawful adverse employment actions motivated by animus because of his race, color and/or national origin (sometimes referred to as "reverse discrimination"), she repeatedly refused to take prompt action to end the adverse employment action directed at plaintiff;

    b.   Although she knew or should have known that, subsequent to plaintiff's release to work without restrictions after his first FM, he was being subjected to unlawful adverse employment actions motivated by defendants' disability-based animus, she repeatedly refused to take prompt action to end the adverse employment action directed at plaintiff;

161.    If Ms. Moran was not directly involved in causing illegal adverse employment actions to be directed against plaintiff then, a result of the aforesaid conduct, she was plaintiff's "employer" as that term is defined under PHRA.

162.    Thereafter, defendants illegally terminated plaintiff's employment thereafter; however, even if the cessation of plaintiff's employment is, as contended by RIBM, designated a resignation via job abandonment, we assert that the above actions and inactions collectively resulted in an unlawful constructive discharge for which RIBM is liable.

163.    The end of plaintiff's employment came about when he demanded that Mr. Ehiogie be terminated due to a number of reasons, some of which involved threats he believed Mr. Ehiogie had made against him. plaintiff refused to return to work subsequent to October 2nd .

164.    Plaintiff believes, and therefore avers, that defendant' were or should have been aware of plaintiff's rights under FMLA, and that they failed to act in good faith when they, *inter alia*, failed to provide plaintiff with his rights under FMLA as required by law, and thereafter unlawfully terminated plaintiff's employment.

165.    As a result of the aforesaid unlawful actions by defendant, plaintiff suffered, and continues to suffer, damages in the form of, *inter alia*, lost wages and benefits.

## COUNT I
## PLAINTIFF v. ALL DEFENDANTS
## <u>Violations of FMLA</u>

166.    Plaintiff hereby incorporates all other paragraphs in this Complaint as though fully set forth at length herein.

167.    Ms. Culbert and Mr. Campanini were at all times material hereto aware that interfering with plaintiff's right to take FML, or retaliating against him on account of his exercise of same by punishing him through adverse employment actions, violated both the letter and spirit of the FMLA.

168.    Ms. Culbert and Mr. Campanini were at all times material hereto aware that plaintiff had been approved for, and had taken, FML in between June 26 and July 9, 2014.

169.    Ms. Culbert and Mr. Campanini were at all times material hereto aware that plaintiff was entitled to full job restoration upon the conclusion of his FML, and that a) any failure to reinstate plaintiff to his former position would constitute unlawful interference and/or retaliation under FMLA; b) changing plaintiff's work hours would constitute unlawful interference and/or retaliation under FMLA; and, c) reducing the number of hours that plaintiff was scheduled to work each week would constitute unlawful interference and/or retaliation under FMLA.

170.    Despite the foregoing, Ms. Culbert and Mr. Campanini, acting in concert, and with the knowledge, guidance and consent of Ms. Moran, purposefully and intentionally directed, carried out and participated in the following unlawful acts, and others:

    a.    Over plaintiff's protestations, they refused to immediately reinstate plaintiff to his former position as full-time Night Auditor upon expiration of his FML on July 10, 2014;

27

b.  Over plaintiff's protestations, they refused to schedule plaintiff for any work during the two (2) weeks immediately following the conclusion of his FML on July 10, 2014;

c.  Over plaintiff's protestations, they refused to reinstate plaintiff to his former position as full-time Night Auditor even after plaintiff was placed back onto the front desk work schedule on July 22, 2014;

d.  Over plaintiff's protestations, they scheduled plaintiff for less hours of work beginning as of the date that plaintiff was placed back onto the front desk work schedule following his initial medical leave (July 22, 2014) up until plaintiff's last date of work 2-months later (October 2, 2014);

e.  Over plaintiff's protestations, and despite the fact that plaintiff had prior to his medical leave been scheduled to work his preferred shift (the overnight shift), they refused schedule plaintiff for said shift, instead scheduling him to work day and evening shifts, beginning as of the date that plaintiff was placed back onto the front desk work schedule following his initial medical leave (July 22, 2014) and up until plaintiff's last date of work 2-months later (October 2, 2014);

f.  They refused to locate, return or replace plaintiff's desk chair, which was necessary for his physical integrity and comfort, even after plaintiff advised him upon returning for his initial medical leave that the chair was missing;

g.  They refused to insure that plaintiff was provided with a desk chair when he was scheduled to work overnight shift, even though plaintiff had repeatedly requested such accommodation and even though they were aware that a chair was necessary to the physical integrity and comfort of anyone who, like plaintiff, was required to enter financial data into a computer for 5-7 hours a shift;

h.  They refused to conduct a meaningful investigation into complaints plaintiff made concerning threatening words and deeds made and/or undertaken by his putative replacement, Kenneth Ehiogie;

i.  They refused to take corrective action against putative replacement, Kenneth Ehiogie, despite being made aware that Mr. Ehiogie directed threatening words and deeds towards plaintiff;

j.  They refused to approve a request for Family and Medical Leave made by plaintiff in September 2014 arising out of the injuries to plaintiff's leg resulting from their decisions to 1) refuse and ignore plaintiff's request that the chair that he used prior to his first FML be retrieved or replaced; 2) refuse and ignore plaintiff's request that Mr. Ehiogie be required to not remove or leave the chair Mr. Ehiogie in the office he shared with plaintiff for plaintiff's use when he worked the overnight shift;

28

k.  Through other words and deeds not necessary to the adequacy of this pleading, they engaged in a course of additional conduct which, in collaboration with that set forth hereinabove, they intended to cause the cessation of plaintiff's employment by causing plaintiff to 1) engage in workplace misfeasance sufficient to justify his termination with cause; or, 2) voluntarily resign his employment;

l.  They permitted, maintained and fostered a hostile work environment by consistently directing aggressive, dismissive and inequitable actions towards plaintiff on account of actions by plaintiff they allegedly found to be improper, incorrect, insubordinate or violative of company policy, while at the same time they failed and refused to discipline, warn or counsel Mr. Ehiogie for similar (or worse) actions; and,

m.  When responding to similar workplace behavior engaged upon by plaintiff and Mr. Ehiogie, they routinely and consistently treated Mr. Ehiogie more favorably than they did plaintiff.

171.  Subsequent to June 24, 2014, Ms. Culbert and Mr. Campanini -- acting in concert, and with deliberate and intended purpose -- spearheaded an unlawful, willful, vexatious and relentless campaign on behalf of Waterford's management to create a hostile work environment so poisonous that plaintiff would eventually either 1) engage in behavior that would warrant on its face warrant termination; or, 2) would voluntarily resign his position.

172.  As a result of the aforesaid conduct, Ms. Culbert and Mr. Campanini were plaintiff's "employer" as that term is defined under the Family and Medical Leave Act.

173.  Ms. Moran was at all times material hereto aware that interfering with plaintiff's right to take FML, or retaliating against him on account of his exercise of same by punishing him through adverse employment actions, violated both the letter and spirit of the FMLA.

174.  Ms. Moran was at all times material hereto aware that plaintiff had been approved for, and had taken, FML in between June 26 and July 9, 2014.

175.     Ms. Moran was at all times material hereto aware that plaintiff was entitled to full job restoration upon the conclusion of his FML, and that a) any failure to reinstate plaintiff to his former position would constitute unlawful interference and/or retaliation under FMLA; b) changing plaintiff's work hours would constitute unlawful interference and/or retaliation under FMLA; and, c) reducing the number of hours that plaintiff was scheduled to work each week would constitute unlawful interference and/or retaliation under FMLA.

176.     Despite the foregoing, Ms. Moran authorized Ms. Culbert and Mr. Campanini to purposefully and intentionally engage in the following unlawful acts, and/or acquiesced to same, such actions including, but not limited to the following:

a.   Over plaintiff's protestations, they refused to immediately reinstate plaintiff to his former position as full-time Night Auditor upon expiration of his FML on July 10, 2014;

b.   Over plaintiff's protestations, they refused to schedule plaintiff for any work during the two (2) weeks immediately following the conclusion of his FML on July 10, 2014;

c.   Over plaintiff's protestations, they refused to reinstate plaintiff to his former position as full-time Night Auditor even after plaintiff was placed back onto the front desk work schedule on July 22, 2014;

d.   Over plaintiff's protestations, they scheduled plaintiff for less hours of work beginning as of the date that plaintiff was placed back onto the front desk work schedule following his initial medical leave (July 22, 2014) up until plaintiff's last date of work 2-months later (October 2, 2014);

e.   Over plaintiff's protestations, and despite the fact that plaintiff had prior to his medical leave been scheduled to work his preferred shift (the overnight shift), they refused schedule plaintiff for said shift, instead scheduling him to work day and evening shifts, beginning as of the date that plaintiff was placed back onto the front desk work schedule following his initial medical leave (July 22, 2014) and up until plaintiff's last date of work 2-months later (October 2, 2014);

f.   They refused to locate, return or replace plaintiff's desk chair, which was necessary for his physical integrity and comfort, even after plaintiff advised him upon returning for his initial medical leave that the chair was missing;

g. They refused to insure that plaintiff was provided with a desk chair when he was scheduled to work overnight shift, even though plaintiff had repeatedly requested such accommodation and even though they were aware that a chair was necessary to the physical integrity and comfort of anyone who, like plaintiff, was required to enter financial data into a computer for 5-7 hours a shift;

h. They refused to conduct a meaningful investigation into complaints plaintiff made concerning threatening words and deeds made and/or undertaken by his putative replacement, Kenneth Ehiogie;

i. They refused to take corrective action against putative replacement, Kenneth Ehiogie, despite being made aware that Mr. Ehiogie directed threatening words and deeds towards plaintiff;

j. They refused to approve a request for Family and Medical Leave made by plaintiff in September arising out of the injuries to plaintiff's leg resulting from their decisions to 1) refuse and ignore plaintiff's request that the chair that he used prior to his first FML be retrieved or replaced; 2) refuse and ignore plaintiff's request that Mr. Ehiogie be required to not remove or leave the chair Mr. Ehiogie in the office he shared with plaintiff for plaintiff's use when he worked the overnight shift;

k. Through other words and deeds not necessary to the adequacy of this pleading, they engaged in a course of additional conduct which, in collaboration with that set forth hereinabove, they intended to cause the cessation of plaintiff's employment by causing plaintiff to 1) engage in workplace misfeasance sufficient to justify his termination with cause; or, 2) voluntarily resign his employment;

l. They permitted, maintained and fostered a hostile work environment by consistently directing aggressive, dismissive and inequitable actions towards plaintiff on account of actions by plaintiff they allegedly found to be improper, incorrect, insubordinate or violative of company policy, while at the same time they failed and refused to discipline, warn or counsel Mr. Ehiogie for similar (or worse) actions; and,

m. When responding to similar workplace behavior engaged upon by plaintiff and Mr. Ehiogie, they routinely and consistently treated Mr. Ehiogie more favorably than they did plaintiff.

177. Subsequent to June 24, 2014, Ms. Moran not only authorized the above conduct, she developed, coordinated and facilitated the actions of Waterford's management, and personally participated in some or all of the above actions, in order to create a hostile work environment so poisonous that plaintiff would eventually either 1) engage in behavior

that would warrant on its face warrant termination; or, 2) would voluntarily resign his position.

178.    As a result of the aforesaid conduct, Ms. Moran was plaintiff's "employer" as that term is defined under the Family and Medical Leave Act.

179.    Defendants violated the FMLA by failing to provide plaintiff with notice of his rights under FMLA in or around September 21, 2014, when he required and was entitled to such leave due to a serious physical condition affecting his leg that made him unable to perform his essential job duties.

180.    Defendants violated the FMLA by interfering with plaintiff's right to FMLA leave by having Mr. Campanini persistently contact plaintiff's father to inquires as to when plaintiff was going to return to work while he was out on FMLA leave.

181.    Defendants violated the FMLA by retaliating against plaintiff, as described hereinabove, after he advised that he was ready, able and willing to return from his initial FML leave on or about July 9, 2014.

182.    Defendants violated plaintiff by terminating his employment or constructively discharging his employment because he exercised and/or sought to exercise his rights to FML.

183.    As a result of the aforesaid conduct of defendant, plaintiff suffered, *inter alia*, a loss of income and employment, and all of the benefits attendant thereto, which damages continue at present and which may continue to do so in the foreseeable future, as well as humiliation, embarrassment, loss of reputation and self-esteem, fear for his personal safety and that of his family and emotional distress.

WHEREFORE, plaintiff Steven A. Reese demands, pursuant to all applicable provisions of the Family and Medical Leave Act of 1993, 29 U.S.C. §§2601 *et seq.,* ("FMLA"), that a

judgment be entered in his favor and against defendants, Waterford Hotel Group, Inc., Waterford

Group, L.L.C., Mary Culbert, Peter Campanini and Judith Moran, as follows:

     a.    all wages and benefits to which plaintiff is entitled pursuant to §2617(A) of FMLA;

     b.    pre and post-judgment interest thereon in accordance with §2617(A)(ii) of FMLA;

     c.    liquidated damages in accordance with §2617(A)(iii) of FMLA;

     d.    An Order issued by Your Honorable Court reinstating plaintiff to the position he occupied prior to the defendants' unlawful violation(s) of FMLA, said Order of reinstatement being accompanied by defendants' retroactive credit(s) of all rights and benefits to which plaintiff would have been entitled as of the date of judgment absent defendants' violation of FMLA; OR,

     e.    An award of front pay sufficient to compensate plaintiff for his continuing, ongoing damages; and,

     f.    Such other relief as Your Honorable Court deems just and appropriate.

## COUNT II
### PLAINTIFF v. ALL DEFENDANTS
### Violation of the Equal Rights Act of 1866, as amended,
### 42 U.S.C. §§1981, et seq. ("Section 1981")

184.    Plaintiff hereby incorporates by reference all other paragraphs of his complaint

as though more fully set forth at length herein.

185.    Officers, managers and employees of a corporation may become personally

liable when they intentionally cause an infringement of rights protected by Section 1981,

regardless of whether the corporation may also be held liable.

186.    The individual defendants herein were are personally involved in the

discrimination and/or retaliation against the plaintiff, and/or aided and abetted same, and they

intentionally caused the defendant employer(s) to infringe upon plaintiff's Section 1981

rights, and/or if they authorized, directed, or participated in the alleged discriminatory conduct.

187.    Defendants unlawfully discriminated against plaintiff because he was a white Caucasian of American descent.

188.    Said discrimination is described at length herein above, and will not be restated at length herein.

189.    However, in summary, said discrimination included promoting Mr. Ehiogie into the Full-Time Night Auditor position previously filed by plaintiff, allowing Mr. Ehiogie to remain in that position despite plaintiff's protests, failing to discipline or correct Mr. Ehiogie after being informed of his misconduct by plaintiff and retaining Mr. Ehiogie's employment despite being provided information from plaintiff warranting his discharge.

190.    Defendants' decision to choose Mr. Ehiogie as plaintiff's replacement, and to thereafter retain him in that position, was the result of defendants' knowing and intentional decision to hire, promote and favor black and/or foreign-born and/or minority employees over white, Caucasian, American employees such as plaintiff.

191.    Defendants' actions and inactions, which culminated in the termination and/or constructive discharge of plaintiff, violated Section 1981.

192.    As a result of the aforesaid conduct of defendant, plaintiff suffered, *inter alia*, a loss of income and employment, and all of the benefits attendant thereto, which damages continue at present and which may continue to do so in the foreseeable future, as well as humiliation, embarrassment, loss of reputation and self-esteem, fear for his personal safety and that of his family and emotional distress.

WHEREFORE, plaintiff Steven A. Reese demands, pursuant to all applicable provisions of the Equal Rights Act of 1866, as amended, 42 U.S.C. §§1981, *et seq.*, that a judgment be

entered in his favor and against defendants, Waterford Hotel Group, Inc., Waterford Group, L.L.C., Mary Culbert, Peter Campanini and Judith Moran, in a sufficient amount to fully compensate him for his compensable losses, along with attorney fees, punitive damages, costs and such other relief as Your Honorable Court deems just and appropriate.

**COUNT III**
**PLAINTIFF v. WATERFORD HOTEL GROUP, INC., WATERFORD GROUP, L.L.C.**
<u>Violation of the Title VII of the Civil Rights Act of 1964, as amended, 42</u>
<u>U.S.C. §§2000e, *et seq*. ("Title VII")</u>

193.   Plaintiff hereby incorporates by reference all other paragraphs of his complaint as though more fully set forth at length herein.

194.   The Waterford Defendants unlawfully discriminated against plaintiff because he was a white Caucasian of American descent.

195.   Said discrimination is described at length herein above, and will not be restated at length herein.

196.   However, in summary, said discrimination included promoting Mr. Ehiogie into the Full-Time Night Auditor position previously filed by plaintiff, allowing Mr. Ehiogie to remain in that position despite plaintiff's protests, failing to discipline or correct Mr. Ehiogie after being informed of his misconduct by plaintiff and retaining Mr. Ehiogie's employment despite being provided information from plaintiff warranting his discharge.

197.   The Waterford Defendants' decision to choose Mr. Ehiogie as plaintiff's replacement, and to thereafter retain him in that position, was the result of defendants' knowing and intentional decision to hire, promote and favor black and/or foreign-born and/or minority employees over white, Caucasian, American employees such as plaintiff.

198.   The Waterford Defendants' actions and inactions, which culminated in the termination and/or constructive discharge of plaintiff, violated Section 1981.

199.    As a result of the aforesaid conduct of the Waterford Defendants, plaintiff suffered, *inter alia*, a loss of income and employment, and all of the benefits attendant thereto, which damages continue at present and which may continue to do so in the foreseeable future, as well as humiliation, embarrassment, loss of reputation and self-esteem, fear for his personal safety and that of his family and emotional distress.

WHEREFORE, plaintiff Steven A. Reese demands, pursuant to all applicable provisions of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e, *et seq.*, that a judgment be entered in his favor and against defendants, Waterford Hotel Group, Inc. and Waterford Group, L.L.C., in a sufficient amount to fully compensate him for his compensable losses, along with attorney fees, punitive damages, costs and such other relief as Your Honorable Court deems just and appropriate.

**COUNT IV**
**PLAINTIFF v. WATERFORD HOTEL GROUP, INC., WATERFORD GROUP, L.L.C.**
**Violation of the Americans With Disabilities Act of 1990, as amended,**
**42 U.S.C. §§12101, *et seq.* ("ADA")**

200.    Plaintiff hereby incorporates by reference all other paragraphs of his complaint as though more fully set forth at length herein.

201.    Subsequent to receiving treatment in June 2014, plaintiff was ready, willing and able to return to work as of on or about July 10, 2014.

202.    As of July 10, 2014, plaintiff was sober and not ingesting any addictive medications.

203.    As of July 10, 2014, plaintiff was disabled, as that term is defined in the ADA.

204.    Despite said disability, plaintiff was able to perform all major life activities, including working, with or without a reasonable accommodation.

205.    As of July 10, 2014, and at all relevant times thereafter, defendants (incorrectly) believed that because plaintiff had a disability, he was unable to perform all major life activities, such as, *inter alia*, working, with or without a reasonable accommodation.

206.    As a result of their incorrect belief that persons with disabilities such as that disability suffered by plaintiff could not perform their job duties, defendants subjected plaintiff to demotion, disparate treatment as compared to other employees who were not disabled, a hostile work environment, termination and/or constructive discharge.

207.    As of July 10, 2014, and at all relevant times thereafter, defendants regarded plaintiff as disabled, and believed he was as a consequence thereof unable to perform all major life activities, such as, *inter alia*, working, with or without a reasonable accommodation.

208.    Because defendants regarded plaintiff as disabled, and unable to perform major life activities such as, *inter alia*, working, with or without a reasonable accommodation, defendants subjected plaintiff to demotion, disparate treatment as compared to other employees they did not regard as disabled, a hostile work environment, termination and/or constructive discharge.

209.    As a result of the aforesaid conduct of defendants, which violated the ADA, plaintiff suffered, *inter alia*, a loss of income and employment, and all of the benefits attendant thereto, which damages continue at present and which may continue to do so in the foreseeable future, as well as humiliation, embarrassment, loss of reputation and self-esteem, fear for his personal safety and that of his family and emotional distress.

WHEREFORE, plaintiff Steven A. Reese demands, pursuant to all applicable provisions of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. §§12101, *et seq.*, that a judgment be entered in his favor and against defendants, Waterford Hotel Group, Inc. and Waterford Group, L.L.C., in a sufficient amount to fully compensate him for his compensable

losses, along with attorney fees, punitive damages, costs and such other relief as Your Honorable Court deems just and appropriate.

**COUNT V**
**PLAINTIFF v. ALL DEFENDANTS**
**<u>Violation of Pennsylvania's Human Relations Act of 1955, as amended,</u>**
**<u>43 Pa.C.S. §§951 to 963 ("PHRA")</u>**

210.     Plaintiff hereby incorporates by reference all other paragraphs of his complaint as though more fully set forth at length herein.

211.     Subsequent to receiving treatment in June 2014, plaintiff was ready, willing and able to return to work as of on or about July 10, 2014.

212.     As of July 10, 2014, plaintiff was sober and not ingesting any addictive medications.

213.     As of July 10, 2014, plaintiff was disabled, as that term is defined in the PHRA.

214.     Despite said disability, plaintiff was able to perform all major life activities, including working, with or without a reasonable accommodation.

215.     As of July 10, 2014, and at all relevant times thereafter, defendants (incorrectly) believed that because plaintiff had a disability, he was unable to perform all major life activities, such as, *inter alia*, working, with or without a reasonable accommodation.

216.     As a result of their incorrect belief that persons with disabilities such as that disability suffered by plaintiff could not perform their job duties, defendants subjected plaintiff to demotion, disparate treatment as compared to other employees who were not disabled, a hostile work environment, termination and/or constructive discharge.

38

217.     As of July 10, 2014, and at all relevant times thereafter, defendants regarded plaintiff as disabled, and believed he was as a consequence thereof unable to perform all major life activities, such as, *inter alia*, working, with or without a reasonable accommodation.

218.     Because defendants regarded plaintiff as disabled, and unable to perform major life activities such as, *inter alia*, working, with or without a reasonable accommodation, defendants subjected plaintiff to demotion, disparate treatment as compared to other employees they did not regard as disabled, a hostile work environment, termination and/or constructive discharge.

219.     As set forth hereinabove, the individual defendants herein aided and abetted the employer defendants' discriminatory actions and inactions, which were the result of animus directed against plaintiff on account of disability and/or perceived disability, which defendants incorrectly believed rendered plaintiff incapable of performing his job with or without a reasonable accommodation.

220.     Due to the aforesaid conduct of defendants, plaintiff suffered, *inter alia*, a loss of income and employment, and all of the benefits attendant thereto, which damages continue at present and which may continue to do so in the foreseeable future, as well as humiliation, embarrassment, loss of reputation and self-esteem, fear for his personal safety and that of his family and emotional distress.

WHEREFORE, plaintiff Steven A. Reese demands, pursuant to all applicable provisions of the Pennsylvania's Human Relations Act of 1955, as amended, 43 Pa.C.S. §§951 to 963, that a judgment be entered in his favor and against defendants, Waterford Hotel Group, Inc., Waterford Group, L.L.C., Mary Culbert, Peter Campanini and Judith Moran, in a sufficient amount to fully compensate him for his compensable losses, along with attorney fees, costs and such other relief as Your Honorable Court deems just and appropriate.

October 17, 2016                    GALLAGHER LAW GROUP, P.C.


                              BY:   **/s/ John A. Gallagher**
                                    JOHN A. GALLAGHER, Esquire
                                    Counsel for Plaintiff
                                    1055 Westlakes Drive, 3rd Floor
                                    Berwyn, PA 19312
                                    (610) 647-5027
                                    (610) 647-5024 (fax)
                                    jag@johnagallagher.com